# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 20, 2012 Session

## STATE OF TENNESSEE v. MELISSA L. GRAYSON

**Appeal from the Criminal Court for Davidson County**
**No. 2008-A-10      Steve R. Dozier, Judge**

---

**No. M2011-00648-CCA-R3-CD - Filed August 20, 2012**

---

A Davidson County Grand Jury indicted appellant, Melissa Grayson, for aggravated assault, two counts of aggravated robbery, and two counts of especially aggravated kidnapping. Following jury verdicts of guilty on all five counts, the trial court sentenced appellant to an effective seventeen-year sentence. Appellant claims the following errors at trial: 1) the trial court erred in declaring a witness unavailable and allowing the State to introduce his preliminary hearing testimony; 2) the trial court erred in permitting the State to elicit improper character evidence from a witness; and 3) the evidence was insufficient to sustain the convictions. The State contends that appellant has waived the first two issues because her motion for new trial was untimely. We have concluded that the State is correct with respect to its waiver argument and further, that the evidence was sufficient to sustain the verdicts. Accordingly, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Manuel B. Russ, Nashville, Tennessee (on appeal); Fletcher W. Long and Edward T. Farmer, Springfield, Tennessee (at trial), for the appellant, Melissa Grayson.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Pamela Sue Anderson and Rachel Sobrero, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

Appellant, together with four co-defendants, was charged with five criminal offenses contained in an eight-count indictment; three counts of the indictment pertained to the co-defendants and did not involve appellant. Appellant's jury trial began on June 22, 2009.

## I. Facts and Procedural History

Before the trial began, the trial court heard the State's motion to declare one of its witnesses, Noe Hernandez, unavailable. The State requested that the trial court allow it to play the videotaped recording of Mr. Hernandez's testimony from the preliminary hearing. At the prior hearing, Mr. Hernandez was subject to cross-examination by appellant.

In response, appellant asked that the court ensure that only the testimony pertaining to the counts of the indictment being tried at that time be played for the jury. Appellant also noted that during the preliminary hearing testimony, in cross-examining Mr. Hernandez, she made a comparison regarding blonde hair color by relating it to an attorney who was in the courtroom at the hearing. The attorney's image was not captured on the video. Appellant asked that the attorney be present in the courtroom while the video was being played so that the jury could visualize the comparison.

The court confirmed with appellant, "[Y]ou're not denying that Mr. Hernandez is unavailable[?]," to which appellant responded, "Right." Appellant did not wish to be heard any further on the State's motion.

The State asserted, for the record, that their office employed a Spanish-speaking Victim Witness Coordinator who maintained contact with Mr. Hernandez after the preliminary hearing. At some point, she lost contact with the witness. For at least two months prior to trial, the State's investigator attempted to locate Mr. Hernandez by several different means, including going out into the streets and checking computer databases. His efforts yielded the contact information for one of the witness's relatives. The investigator tried to contact Mr. Hernandez through the relative, to no avail. Mr. Hernandez received a speeding ticket that the investigator used to attempt to locate him by tracking down the information on the ticket, such as Mr. Hernandez's contact address, telephone numbers, and information about the vehicle. As recently as the Thursday preceding the Monday trial, the investigator was still trying to find Mr. Hernandez. The trial court ruled that, absent an objection, it would grant the State's motion conditioned upon the blonde attorney being seated in the courtroom at the time the State played the videotape for the jury.

The State opened its case-in-chief with the testimony of the victim, Hermilio Morales. According to his testimony, Mr. Morales lived in an apartment complex on Webster Street in Davidson County on July 19, 2007. He was employed as a construction worker in Hendersonville, Tennessee. On that day, he returned home from work at approximately 4:00 p.m. Upon arriving home, he and his friend Emar Garcia walked from the parking lot along the walkway toward their apartment. Two men, one Caucasian and one African-American, came toward them from the breezeway of the apartment building. As Mr. Morales and Mr. Garcia entered the breezeway, one of the men displayed a firearm, and the white man told them not to move. Mr. Garcia ran toward the opposite end of the breezeway and escaped.

Upon seeing the weapon, Mr. Morales stopped. The men took his wallet out of his back pocket and told him that he had go to with them. They pushed him from the breezeway out of the building. Mr. Morales did not know the men and did not want to go with them. They put him in the back seat of a green, four-door vehicle that resembled an Explorer. The white man got in first, then the black man pushed Mr. Morales into the vehicle. Two women were in the front of the vehicle. He could not see much about the women except that they were young and white. He was afraid because the men were leading him with a firearm, so he did not have the opportunity to observe the women very well. As one of the women began to drive, the men searched Mr. Morales's pockets. They removed his cellular telephone and his keys. The driver pulled the vehicle on to Webster Street. Mr. Morales saw the apartment complex security guard driving a golf cart. Mr. Morales screamed, "Help!" out of the window. The white man then struck Mr. Morales in the head and pushed him down in the vehicle.

Mr. Morales recalled that the white man spoke Spanish. He did not hear any other occupant of the vehicle speak Spanish. As the woman continued to drive the Explorer, the white man told him to remove his pants. Mr. Morales complied, and the black man beat him on his head and face with his fists. The men also removed Mr. Morales's shirt. At that time, he heard the women in the front of the vehicle saying, "We can't leave him here, because there's a lotta [sic] people." They continued to drive for a few more minutes, then the woman pulled the vehicle to the side of the road. One of the men pulled Mr. Morales out of the Explorer and onto the ground, while the other man pushed him out. The black man hit him again while he was on the ground. The black man got back into the vehicle and all four people left. Mr. Morales was left lying on the street wearing his underwear.

Mr. Morales walked to the first house he saw, and someone called the police for him. When the police arrived, he told them the color of the automobile in which he was kidnapped and how many individuals were involved. The police took Mr. Morales to a hospital, where personnel cleaned his wounds. Due to one of the blows to his face, in the area of his eye, Mr.

Morales's eye was red for approximately two months. Mr. Morales estimated that the vehicle traveled for approximately ten minutes before the men dumped him on the side of the road.

Officer Jackson Smythe testified he responded to the call to render aid to Mr. Morales. The caller indicated there was a man with blood on his face who needed help. Officer Smythe, together with Officer Brian Otto, arrived at the scene, which was located at 717 Howse Avenue. Officer Smythe first observed that Mr. Morales had a very large cut above his eye and that his eyebrow was "literally hanging off." Mr. Morales was not wearing a shirt. Officers attempted to persuade Mr. Morales to seek medical attention, but he declined. Otherwise, Mr. Morales was cooperative with law enforcement. Officer Smythe believed that Officer Otto could handle the rest of the situation, so he returned to duty.

Officer Brian Otto, a patrol officer with the Metropolitan Nashville Police Department, was on duty on July 19, 2007. He testified that he was dispatched to 717 Howse Avenue to respond to a call that a person had shown up on the doorstep of the home and was injured. When he arrived, Officer Otto encountered Mr. Morales and noted that he had a bloody nose and a bloody lip. His ear was bloody as well, and he had a cut above his eye. In questioning Mr. Morales, Officer Otto ascertained that the events began on East Webster Street. Officer Otto was familiar with the East Webster Street area and stated it was five to ten minutes away from Howse Avenue, depending on the traffic.

Before responding to the call involving Mr. Morales, Officer Otto responded to a similar call on Wellworth Street involving an injured person and a stolen car. He believed that these two events were separate incidents. When Officer Otto arrived at Wellworth Street, another officer was speaking with the victim, Noe Hernandez. The two locations were in the same general area, approximately three to four miles apart. Both locations contained single-family dwellings, though there were some duplexes along Wellworth Street. Both locations were fairly quiet, and Officer Otto did not observe any neighborhood onlookers at either scene. Officer Otto testified that, due to the time required for the victims to summon help and for the dispatcher to send officers to the locations, he could not be certain at what times the offenses occurred.

Officer Kevin Cooley was a patrol officer in the North Precinct of the Metropolitan Nashville Police Department. He testified that on July 19, 2007, he responded to a call at 300 East Webster Street. The call involved a robbery and kidnapping. When he arrived, he spoke with one of the victims, Emar Garcia, in the parking lot of one of the apartment buildings. Officer Cooley also spoke with a maintenance person who witnessed some of the events. Officer Cooley did not have direct contact with Mr. Morales, since he was in a different location. In completing the incident report, Officer Cooley communicated primarily with Officer Smythe so that they could clearly understand the events as they occurred.

-4-

Officer Matthew Grindstaff was assigned to the patrol division of the Metropolitan Nashville Police Department's North Precinct in July 2007. On July 19th, he responded to a call involving a robbery and kidnapping on Wellworth Street. Officer Grindstaff spoke with the victim, Mr. Hernandez, and observed that he had a cut on his lip and a lump on his forearm. Mr. Hernandez was cooperative with Officer Grindstaff. Mr. Hernandez gave Officer Grindstaff a description of the suspects, which the officer made known to other units in the area. Police recovered Mr. Hernandez's stolen vehicle toward the back of an adjacent field between some trees. Officer Grindstaff called an "identification" unit to the scene to process the vehicle and take photographs. The trunk of the car was open when officers recovered it. Officer Grindstaff did not personally collect any physical evidence.

Officer Rhonda Evans was a crime scene investigator with the Metropolitan Nashville Police Department. Her duties involved documenting crime scenes and collecting evidence. She testified she was working on July 19, 2007, and received a call to respond to a scene on Wellworth Street. Officer Grindstaff was the officer on the scene when she arrived. He requested that she process Mr. Hernandez's vehicle for fingerprints and take photographs so that he could take possession of it. She observed that Mr. Hernandez had a scratch on him but was fully clothed. Officer Evans took several photographs at the scene, some of which depicted Mr. Hernandez's vehicle. The vehicle had been driven into another abandoned vehicle. Officer Evans obtained several latent fingerprints from the exterior of the car but did not receive a match on any of them.

During the course of the trial, the State became aware that its efforts to locate Noe Hernandez had resulted in serving a different "Noe Hernandez" with a subpoena. The speeding ticket that the State located had been issued to the other Mr. Hernandez. The State traced the information on the speeding ticket to an electric bill bearing the other Mr. Hernandez's name. Investigators utilized the information on the electric bill to determine the address that they should use to personally serve the notice advising Mr. Hernandez that he needed to be in court. The other Mr. Hernandez had been the victim of a car theft in 2004 at a local mall, thus, he believed he was coming to court for that incident. When the other Mr. Hernandez appeared, the State quickly realized that he was the wrong individual. The State developed the trial record by asking the other Mr. Hernandez some questions for clarification.

The realization that the State had located the wrong individual prompted an objection from appellant's trial counsel, arguing that the State's efforts to locate the proper Mr. Hernandez were aimed toward the wrong person and that the State had failed to show the witness was unavailable. The trial court asked the State to offer proof as to the efforts it made to secure the correct witness.

In making its offer of proof, the State presented Jessica Turner, a Victim Witness Coordinator with the Office of the District Attorney General, as a witness. She specialized in working with Spanish-speaking victims and witnesses. She worked with the victims in this case at the preliminary hearing on July 31, 2007. At that time, she ensured that the victims understood the importance of staying in touch with her. She wrote down addresses and confirmed that they were correct. She obtained two telephone numbers for Mr. Hernandez. Ms. Turner attempted to contact Mr. Hernandez on January 28, 2008. Both of the telephone numbers were invalid. She then mailed Mr. Hernandez a letter informing him that the grand jury had issued an indictment in his case. She received the letter back in the mail on January 30, 2008. Because she often works with people whose telephones are temporarily out of service, Ms. Turner continued to try to reach Mr. Hernandez using the telephone numbers he gave her. She tried the numbers again on April 16, 2008. One of the telephone numbers had been reassigned to another individual; the second number was not in service. Ms. Turner tried the telephone number again in August, 2008, and sent another letter at that time. The letter was again returned. While Ms. Turner was on maternity leave, a co-worker, Becky Owens, who also speaks Spanish, sent another letter that was returned.

When Ms. Turner returned from maternity leave, she again tried to contact Mr. Hernandez. At that point, in June of 2009, she began working with Investigator Eddie Simmons. She provided Mr. Simmons all of the information she had relating to Mr. Hernandez. That same month, Mr. Simmons provided Ms. Turner with two telephone numbers for Mr. Hernandez. Neither of the numbers were in service. Ms. Turner prepared some letters for Mr. Simmons to take to the address that the electric company had on file for Mr. Hernandez. Mr. Simmons delivered the information on the Thursday preceding the trial. Ms. Turner received a response the following week, during trial, from Mr. Hernandez's wife. Ms. Hernandez informed Ms. Turner that Mr. Hernandez worked at a meat-packing plant. She confirmed that Mr. Hernandez had been the victim of a robbery. Ms. Turner tried to locate Mr. Hernandez by calling all of the local meat-packing plants, but was unsuccessful. Mr. Hernandez returned Ms. Turner's call the night before he appeared in court. Having confirmed that he was involved in a robbery involving a car, Ms. Turner did not think she needed to clarify that it was the correct case.

Eddie Simmons, a criminal investigator with the District Attorney General's office, also testified regarding his efforts to locate Noe Hernandez. He testified that Ms. Turner gave him contact information for Mr. Hernandez. The first thing Mr. Simmons did was to gather all of the information that he could find, such as traffic tickets and warrants. He checked addresses through the District Attorney General's criminal offense database. The only information he discovered was the one traffic citation. Mr. Simmons also tried to obtain information from some of the old apartment addresses where Mr. Hernandez had lived but

was unsuccessful. Mr. Simmons obtained two addresses from the power company, Nashville Electric Service (NES), where Mr. Hernandez previously had electric service. The first address was a closed account. The second address was supposed to be his brother's apartment.

Mr. Simmons visited the manager of the apartment, who informed him that Mr. Hernandez did not live there. Mr. Simmons knocked on the apartment door, and after waiting for fifteen to twenty minutes, a woman holding a newborn baby answered the door. Mr. Simmons gave the woman the information provided to him by Ms. Turner.

After hearing the arguments of counsel, the trial court determined that Noe Hernandez was an unavailable witness under Rule 804 of the Tennessee Rules of Evidence. In explaining its ruling, the trial court found that there had been no argument concerning the lack of an opportunity to cross-examine the witness; that the State made diligent efforts in attempting to locate Mr. Hernandez; and that the appearance of the wrong Mr. Hernandez weighed in favor of demonstrating the State's efforts in locating the witness.

After the trial court declared Mr. Hernandez unavailable as a witness, the State showed the jury the videotape of his testimony from the preliminary hearing. Mr. Hernandez testified at the hearing that on July 19, 2007, he left work and returned home. He parked his car at the rear of his house. The two men, one white and one black, approached him. The white man held a gun to his head while the black man hit him in the face. They demanded all of his money, then pushed him into his car. The white man spoke in Spanish to Mr. Hernandez when he demanded $100 and threatened to kill him if he did not comply. The black man did not speak Spanish; he told the victim that if he called the police, he would come back and kill him.

Mr. Hernandez's videotaped testimony from the preliminary hearing indicated the white man was driving, and the black man sat in the back seat with Mr. Hernandez. They drove approximately seven minutes, or two miles, to an isolated area where there were not many houses. They forced Mr. Hernandez to remove his pants, hit him with a pipe, and pushed him into the trunk of his car. After the two men left, Mr. Hernandez climbed out of the trunk wearing only his boxer shorts. He ran to a nearby house to use the telephone. He called the police and made a report. Mr. Hernandez reported damage to his vehicle as a result of the white man not being able to drive a standard transmission automobile. The white man drove Mr. Hernandez's purple Mustang into another vehicle. Mr. Hernandez testified he could see two women driving a green Ford Explorer, and they followed the men as they began driving. Both women had blondish-colored hair, but one's hair was darker than the other. At the conclusion of the video, the jury viewed a photograph of the attorney whose hair color the witness referenced in making his comparison of "blonde hair."

The State's next witness was Johnathon Pressley, but the trial court held a jury-out hearing prior to his testimony. During the jury-out hearing, Mr. Pressley testified that in July of 2007, he lived in a trailer with appellant, Tiffany Williams, Montonio Shelton (a.k.a. "T.O."), Michael Shelton (a.k.a. "Ducky"), and April Donn. Mr. Pressley testified that on July 10, 2007, he, Ms. Williams, and "Ducky" robbed a woman in the parking lot of a mall. Ms. Williams drove the vehicle. On July 24, 2007, Mr. Pressley, "Ducky," and Ms. Williams were involved in the robbery and attempted kidnapping of a Hispanic man. During this time, Mr. Pressley lived with appellant. Mr. Pressley testified that appellant knew about the events after they occurred. The three individuals involved talked about the incidents in her presence. They split the proceeds of the robberies among Ms. Williams, appellant, and "T.O."

Appellant objected to Mr. Pressley's testimony. Trial counsel based his objection on the premise that the jury would assume appellant's guilt in the present cases because she shared in the proceeds of the prior robberies in which she was not directly involved. Appellant argued that the evidence was subject to a balancing test under Tennessee Rule of Evidence 403. The State countered that the evidence was highly probative of appellant's intent and that to disallow the evidence would be to isolate the instant crimes into a vacuum.

The trial court ruled that the evidence could involve several 404(b) issues under the Tennessee Rules of Evidence. The trial court found clear and convincing evidence that Mr. Pressley's testimony was truthful. The court also found that the evidence carried great probative value. The court ruled that identity, knowledge, and intent were material issues in the case, but that more importantly, appellant's criminal responsibility was an issue. The court found that her knowledge of prior robberies was probative to whether she knew what was happening when the two men forced the victims into vehicles against their wills. The trial court ruled that the probative value of the evidence was not outweighed by its prejudicial effect. However, the court ruled that the July 10th robbery was relevant to appellant's knowledge on July 19th but that the July 24th robbery was not. Therefore, the court limited the State's questioning of Mr. Pressley to the incident on July 10th.

Johnathon Pressley then testified before the jury. He admitted he was hopeful that his truthful testimony might gain him leniency or mercy on the charges he was facing at the time. Mr. Pressley testified that in July 2007, he lived with appellant, Ms. Williams, "T.O." and "Ducky." The trailer belonged to Ms. Williams and appellant. Ms. Williams's two children, as well as Mr. Pressley's ex-girlfriend, April Donn, also lived in the trailer. He knew appellant by the nickname "Missy." He identified appellant for the jury. Mr. Pressley testified that appellant and Ms. Williams were sisters. "T.O." was in a relationship with appellant. "Ducky" and "T.O." were cousins.

On July 10, 2007, Mr. Pressley, Ms. Williams, and "Ducky" drove to the Rivergate Mall. Ms. Williams drove her vehicle, which was a green Explorer. Mr. Pressley robbed a woman in the parking lot, stealing her purse. "Ducky" was present but did not participate. Afteward, the three individuals drove to a liquor store and purchased alcohol. They also bought food while they were out. They eventually returned to the trailer. Mr. Pressley, Ms. Williams, and "Ducky" had conversations about the robbery in appellant's presence. Appellant knew about the robbery on the day it occurred and later drank the liquor that they purchased with the proceeds of the robbery.

Mr. Pressley further testified that on July 19, 2007, he was in appellant's green Explorer; appellant was driving. Other members of their group were with them. At some point they observed a man, Noe Hernandez, in a purple Mustang at a Shell Station off Gallatin Road. They decided that they were going "to get" the man driving the Mustang, meaning they intended to rob him. When they saw the Mustang, they stopped to get gas at the same station. They reasoned that Mr. Hernandez had money. When he left in the Mustang, the group followed him in the Explorer. The conversation among the group was very short because Mr. Hernandez pulled up to his house, which was approximately two streets away. He drove around to the back of his house. Appellant stopped in the front of the house on the street.

Mr. Pressley and "T.O." exited the Explorer and walked to the rear of the house. Mr. Pressley pulled a gun while "T.O." patted down Mr. Hernandez and stole his wallet. They pushed him into the Mustang. As they pulled out of the driveway, Mr. Pressley and "T.O." told appellant to follow them. "T.O." rode in the back seat of the Mustang with Mr. Hernandez while Mr. Pressley drove. Mr. Pressley drove the car to a neighborhood where they used to gather, in the area of Wellworth, because Mr. Pressley knew someone who could remove the motor and other valuable parts from the Mustang. Appellant followed in her Explorer. When they arrived at Wellworth, Mr. Pressley drove the Mustang into another abandoned vehicle. They removed Mr. Hernandez from the vehicle and placed him in the trunk, where Mr. Pressley alleged he accidentally struck Mr. Hernandez in the head with a piece of pipe. Mr. Pressley initially shut the trunk, but after he "wiped down" the vehicle, he opened the trunk so Mr. Hernandez could get out. Mr. Pressley used his shirt to wipe away any fingerprints from the Mustang. Mr. Pressley said that it was very hot outside, approximately 100 degrees, and that Mr. Hernandez would have died inside the trunk. They left the Mustang and Mr. Hernandez at that location.

"T.O." and Mr. Pressley entered appellant's Explorer, and they drove away. They traveled to an apartment complex where they saw two Hispanic men walking in the parking lot. They were looking for another victim because Mr. Hernandez did not have any money to steal. When they saw the two men, "T.O." and Mr. Pressley exited the Explorer and

started walking. One of the men saw the gun and started running. The other man, Mr. Morales, stopped, so they grabbed him and took him back to the vehicle. They pushed him into the Explorer. Mr. Pressley stated that they struck Mr. Morales "several, multiple times." They went through his pants pockets, then made him take off his pants. They obtained a very small amount of money and a cell phone from Mr. Morales. Mr. Pressley remembered that Mr. Morales cried out for help when they were leaving the apartment complex, which was why "T.O." hit him. As they drove away, they looked for a place to leave Mr. Morales. Appellant decided on the location, and they dumped him onto the street. They rode around, looking for another victim, but did not find anyone. Mr. Pressley later learned that Mr. Garcia, the man who ran away at the apartment complex, employed Mr. Pressley's sister to babysit his children.

Detective Harold Haney with the Metropolitan Nashville Police Department was an investigator assigned to the North Precinct. Prior to restructuring of the department under the current chief of police, Detective Haney worked exclusively in the armed robberies unit. He was involved in the investigation of a robbery involving Camisha Chitty, who had her purse stolen in the parking lot of the Rivergate Mall. As a result of his investigation, he developed the names of three suspects: Johnathon Pressley, Tiffany Williams, and Michael "Ducky" Shelton. Detective Haney further determined that Ms. Chitty's credit card was used at a liquor store in Hendersonville and at a restaurant, Jersey Mike's, in Goodlettsville.

Detective Haney was also involved in the investigations into the robberies and kidnappings of Noe Hernandez and Hermilio Morales. Approximately five days into his investigation, Detective Haney interviewed suspects in the robberies. One of the suspects was Johnathon Pressley. Mr. Pressley admitted his involvement in the Camisha Chitty robbery and the robberies and kidnappings of Mr. Hernandez and Mr. Morales. Detective Haney questioned appellant after informing her of her *Miranda* rights. The State played the video recording of appellant's interview for the jury.

In her statement to police, appellant stated that she alternated between living at the homes of her sister and her father. She stayed with her sister to help her sister with her children, but she did not live there full time. Appellant had recently quit working at Dave & Buster's because she was going to move back to Atlanta. She owned a green Ford Explorer.

When asked about the offenses, appellant first asserted that she had not had any Mexicans in her car because she did not like them. She stated that a van full of Mexicans almost killed her sister and nephews so she had nothing to do with them. When Detective Haney focused her attention on these specific offenses, appellant first stated she had not witnessed anyone being beaten. She also maintained that "Ducky," not "T.O.," was the black man in her vehicle during the commission of these offenses. Appellant told detectives that

on the previous Thursday, the date of the crimes, she, Ms. Williams, Mr. Pressley, and "Ducky" went to a bar. As they were leaving, some Mexican men began throwing rocks at her vehicle. Mr. Pressley spoke to the men in Spanish from the window, and the men answered back. One of the men "was put" in the vehicle, but appellant asserted that she did not witness him being injured. She then corrected herself and said that the man voluntarily got into her vehicle. At Mr. Pressley's request, she drove the man to his home. While they were driving, appellant did not witness the man being injured or robbed. To her knowledge, the men in the back seat were having a conversation.

Shortly thereafter, appellant stopped her vehicle at a store and went inside. At some point, Mr. Pressley also exited the vehicle. The store was adjacent to an apartment complex. Appellant came out of the store and got back into her vehicle. Mr. Pressley came back to the vehicle with his arm around the shoulders of a Mexican man. Appellant did not see a second man. They got into the back seat, where Mr. Pressley and the Mexican man were speaking Spanish. She heard a "smack" from the back seat and heard the Mexican man scream. She overheard arguing in Spanish, then the Mexican man removed his pants. They drove to an apartment where Mr. Pressley told her the man lived. She stopped, the man exited the vehicle, and went inside. Appellant maintained that she and "T.O." had nothing to do with any of the robberies and that all she did was drive. Appellant admitted no knowledge of the incident involving Mr. Hernandez and the purple Mustang.

Appellant admitted that she and the others hatched a "group idea" to rob Mexican people. She did not expect that they would follow through with the plan because some of them were employed. At the time they discussed robbing Mexicans, the group had been smoking and was high. Following introduction of appellant's statement, the State rested its case.

Appellant elected not to testify. Announcing that she would not present any proof, appellant rested. The jury returned verdicts of guilty on all five counts of the indictment. Following a sentencing hearing, the trial court sentenced appellant as a Range I offender to nine years for each of the aggravated robbery convictions, three years for aggravated assault, and seventeen years for each of the aggravated kidnapping convictions. The court ordered that the sentences run concurrently with each other.

## II. Analysis

### A. Waiver

The record reflects that the clerk's office received and filed the trial court's sentencing order and uniform judgment documents on September 3, 2009. No motion for new trial or

notice of appeal was filed, and the judgments became final on October 3, 2009. On December 14, 2010, the trial court entered an agreed order allowing appellant to file a motion for new trial and notice of appeal.[1] The agreed order's entry date on the clerk's stamp is illegible with the exception of "Dec"; however, the signature page indicates that the trial court signed the order on December 14, 2010. Appellant filed a motion for new trial on February 15, 2011, which the trial court denied on March 11, 2011. Appellant filed a notice of appeal from the trial court's denial of the motion.

Tennessee Rule of Criminal Procedure 33(b) provides that "[a] motion for a new trial shall be made in writing . . . within thirty days of the date the order of sentence is entered." However, the legislature has provided for delayed filing of a motion for new trial and notice of appeal in certain circumstances:

(a)    When the trial judge conducting a hearing pursuant to this part finds that the petitioner was denied the right to an appeal from the original conviction in violation of the Constitution of the United States or the Constitution of Tennessee and that there is an adequate record of the original trial proceeding available for review, the judge can:

. . . . .

(3)    If no motion for a new trial was filed in the original proceeding, authorize a motion to be made before the original trial court within thirty (30) days. The motion shall be disposed of by the original trial court as if the motion had been filed under authority of Rule 59 of the Rules of Civil Procedure.

(b)    *An order granting proceedings for a delayed appeal shall be deemed the final judgment for purposes of review.* If either party does appeal, the time limits provided in this section shall be computed from the date the clerk of the trial court receives the order of the appellate court determining the appeal.

---

[1] Appellant filed a timely pro se petition for post-conviction relief on August 3, 2010, and the post-conviction court appointed counsel to represent her. The trial court's December 14, 2010 order held the petition in abeyance pending the outcome of the instant appeal.

Tenn. Code Ann. § 40-30-113 (2006) (emphasis added); *see Wallace v. State*, 121 S.W.3d 652, 656 (Tenn. 2003). The trial court exercised its discretion to allow delayed filing of a motion for new trial and notice of appeal in this case.

However, the trial court signed the order on December 14, 2010. As noted in Tennessee Code Annotated section 40-30-113, all time limits prescribed by the statute are computed from the clerk's entry date of the trial court's order. The clerk's stamp is unclear except that the order was entered sometime in December of 2010. Notice to appellant is not an issue because appellant's counsel signed the agreed order on December 14, 2010. As the State points out, if the order was entered as late as December 31, 2010, appellant filed her motion for new trial well outside of the thirty-day time limit. Because the provision of Tennessee Rule of Criminal Procedure 33(b) is mandatory, the time for filing a motion for new trial may not be extended. *State v. Stephens*, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007); *see* Tenn. R. Crim. P. 45(b) (specifically excluding time for filing a motion for a new trial from those time periods that the court may, in its discretion, extend). The thirty-day provision is jurisdictional, therefore rendering the trial court's consideration of an untimely motion a nullity and precluding appellant from raising on appeal any issues which should have been raised in the motion for a new trial. *Stephens*, 264 S.W.3d at 728; *see also State v. Bough*, 152 S.W.3d 453, 460 (Tenn. 2004) (holding that a trial judge lacks jurisdiction to rule upon the merits of an untimely motion for new trial (citing Tenn. R. App. P. 3(e))) ; *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). If a motion for new trial is not filed within the mandatory thirty-day period, all issues are deemed waived except for sufficiency of the evidence and sentencing. *Bough*, 152 S.W.3d at 460 (citing Tenn. R. App. 3(e)); *Martin*, 940 S.W.2d.at 569. The thirty-day time period applies regardless of whether any other motion or petition has been filed. Tenn. R. Crim. P. 33, Adv. Comm'n Cmt.

Unlike other rules of procedure, Rule 33 does not contain a provision for untimely filed motions for new trial. *See, e.g,* Tenn. R. Crim. P. 32(f) (withdrawal of guilty plea allowed "for any fair and just reason" before sentence is imposed or "to correct manifest injustice" after judgment entered but before it becomes final); Tenn. R. App. P. 4(a) (in criminal cases, "notice of appeal" document is not jurisdictional and filing may be waived "in the interest of justice"). While this court may waive the untimely filing of the notice of appeal, we do not have the authority to waive the untimely filing of a motion for new trial. *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997); *Stephens*, 264 S.W.3d at 728; *see also State v. Givhan*, 616 S.W.2d 612, 613 (Tenn. Crim. App. 1980); Tenn. R. App. P. 4(a).

Appellant's motion for a new trial must have been filed no later than January 31, 2011, and arguably should have been filed by January 14, 2011. There are no exceptions to the thirty-day time limit within which to file a motion for new trial. As such, for the purpose

of our appellate review, Issues 1 and 2 of appellant's brief are waived.  We will address only Issue 3, sufficiency of the evidence.

## B.  Sufficiency of the Evidence

The standard for appellate review of a claim of insufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e); *see also State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011).  To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319.  This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).  This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).  Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729; *State v. Sisk*,  343 S.W.3d 60, 65 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Because a conviction may not be based solely upon the uncorroborated testimony of an accomplice, it is necessary to ascertain the sufficiency of the evidence in terms of whether the State presented corroboration of any accomplice's testimony.  "[A] conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State*

*v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 33 S.W.3d 531 (Tenn. 2001)).  Our supreme court has explained:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419.

This court reiterated, "An accomplice is defined as one who 'knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument.'" *State v. Tyree Robinson*, W2008-01001-CCA-R3-CD, 2009 WL 1741401, at *7 (Tenn. Crim. App. June 16, 2009) (quoting *State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997)), *perm. app. denied* (Tenn. Nov. 23, 2009).  The pivotal inquiry into whether a witness is an accomplice rests upon "whether the witness could be indicted for the same offense as the defendant." *Id.* (citing *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995)).

Without question, Johnathon Pressley was complicit in the offenses with which appellant was charged.  Indeed, he also was indicted for his participation.  The trial court instructed the jury with regard to accomplice testimony.  Notwithstanding Mr. Pressley's status as an accomplice in this case, viewing the evidence and all inferences drawn therefrom in the light most favorable to the State, the evidence is sufficient to support the jury's verdicts of guilt.

The victim in the first case, Mr. Hernandez, stated that there was a green Ford Explorer stopped in front of his house at the time that Mr. Pressley and another man drove him away in his car.  He also recalled that a blonde woman was in the driver's seat and another woman was in the front passenger seat.  The victim in the second case, Mr. Morales, saw two females in the front seat of the green Ford Explorer in which he was kidnapped. The time line of the crimes as described by Mr. Pressley was confirmed by police officers. Mr. Pressley implicated appellant in both crimes.  Appellant admitted her involvement, in part, with regard to the crime involving Mr. Morales.  The proximity in time and location

between the two incidents provides corroboration of appellant's involvement in both. Moreover, when the accused confesses, the evidence of corroboration "need not be as convincing as the evidence necessary to establish a *corpus delicti* in the absence of a confession." *Ricketts v. State*, 241 S.W.2d 604, 606 (Tenn. 1951). Corroborating evidence is sufficient to sustain a conviction if "it tends to connect the defendant with the commission of the offense, although the evidence is slight, and entitled, when standing by itself, to but little consideration." *Id.*; *see State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000). Furthermore, the jury is the final arbiter of the degree of evidence necessary to corroborate the testimony of an accomplice, and it is sufficient "'if there is some other evidence fairly tending to connect the defendant with the commission of the crime.'" *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (quoting *Clapp v. State*, 30 S.W. 214, 217 (1895)).

### III. Conclusion

We have thoroughly reviewed the parties' briefs and the record in this case. Finding no error in the court below, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE